JUDGE OETKEN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ANTONIO MUÑOZ,

       Plaintiff,

       -against-

THE MANHATTAN CLUB TIMESHARE
ASSOCIATION, INC.

       Defendants.

------------------------------------------------------------X

11 CIV 7037

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, through his attorney, alleges upon personal knowledge and information and belief as follows:

## NATURE OF THIS ACTION

1. This action is brought by Plaintiff to recover damages for defendant's discrimination against him on the grounds of disability and perceived disability, for violations under the Family and Medical Leave Act.

## THE PARTIES

2. Plaintiff is a resident of New York County and was employed at the defendant company between October 2007 and February 2011.

3. Defendant is an entity created under the laws of the state of New York and does business as the Manhattan Club, a timeshare organization operating out of 200 West 56th Street, New York, New York.

## VENUE AND JURISDICTION

4. Venue is properly placed in this county in that the defendant resides in this district.

1

5. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that this action arises, in part, under the Constitution and laws of the United States, specifically the Fair & Medical Leave Act. Pendant claims are brought under the New York City Human Rights Law.

## FACTS UNDERLYING PLAINTIFF'S CLAIMS

6. Plaintiff repeats and realleges all previous allegations.

7. Plaintiff worked for The Manhattan Club Timeshare Association Inc. ("Manhattan Club") from October 2007-February 2011 as Assistant Front Office Manager.

8. Plaintiff received an "Exemplary Manager Award" in 2008 and got two raises that and the following year, one of which was a reward for excellent performance. He was given a satisfactory written review in 2008.

9. All of 2009 went by without incident. He was never given a written review in that year, nor was there any verbal complaint about his performance.

10. Plaintiff is a qualified individual with a disability, specifically, HIV. Although plaintiff never disclosed the exact nature of his disability to his employer, he nevertheless made it clear that he had a serious, chronic health condition. The employer never asked him to disclose, and, indeed, when he offered, was specifically told not to.

11. In or about December 2009 or January 2010, plaintiff requested of his manager a change in schedule for reasons related to his disability.

12. Specifically, Mr. Muñoz's doctor informed him that his HIV medications were not performing as expected, as shown by test results.

2

13. One of the medications he must take is known as "Sustiva," which must be taken at night, and which causes drowsiness.

14. At the time plaintiff was working, at times, very long hours into the night, and specifically had two out of five days scheduled for the graveyard shift.

15. Plaintiff's doctor recommended that to improve his health that he work a day shift all week, because that would likely help with my HIV markers and bring them back to healthy levels.

16. Plaintiff's first request for this accommodation was made verbally to one Lissie Lopez. He told Lissie that he was being treated for a chronic condition that required him to medicate myself at night, which required bed rest in order for the medication to take effect.

17. Her reply was, "The only people entitled to a quality of life are me, Joshua Wirsha, and Salvatore Reale," who were all managers above plaintiff's rank. Lopez further told plaintiff that he and all other managers at his level were to be at the timeshare 24 hours and 7 days a week as required.

18. She noted that specifically needed plaintiff there because he knew the job and could sleep better knowing that plaintiff was there.

19. Plaintiff thereafter gave Lopez a doctor's note stating that I had "a chronic illness ... that require[s] ... medications that require a strict dosing schedule from which variance may cause substantial health risks." The doctor further explained that plaintiff could not work prolonged shifts or after use of the medication at issue.

20.     Ms. Lopez did not respond to this and plaintiff took the matter to HR and told one Bonnie Brooks that was asking for an accommodation under the ADA.[1] Ms. Brooks said that "Lissie runs [plaintiff's] department and can do whatever she wants." However Ms. Brooks said she would talk about it to Ms. Lopez.

21.     On February 1, 2010, plaintiff met with both of the above-mentioned managers and they asked him how long I had to be on this proposed scheduled change.

22.     Plaintiff explained that he had a serious, chronic condition, and he would be medicating himself for the rest of his life. It was at this time that plaintiff asked both Lissie and Bonnie if they wanted him to disclose what condition he had, and they both in unison told him no.

23.     Both of them then stated in substance that plaintiff knew what the position required of him when he was hired and that he could do the job as Lopez was asking me to do or that plaintiff could quit and that she "would not work with [her] hands tied."

24.     Plaintiff was denied the accommodation, even though he knew there were one or two people who were willing to take his shift.

25.     Plaintiff asked for the denial in writing, but this request was denied.

26.     Shortly thereafter, plaintiff asked for a week off to talk to his doctor and consider his options.

27.     Plaintiff's doctor told him that the only *possible* thing he could do was try a new medication, which might or might not have worked. His current medication

---

[1] Although at this time, the EEOC has received a complaint, it has not yet issued a right to sue letter. Nevertheless, these were plaintiff's words.

regimen, when taken properly, did work, so he decided he could not risk his health by changing HIV medications, whose prescription can be volatile.

28. Furthermore, plaintiff's doctor advised that if the new medications did not work, he would become resistant to the old medication and would not be able to switch back, further risking his health and life.

29. Plaintiff went back to work after the week at the schedule that my doctor had specifically asked me not to perform, not knowing what to do, and unsure how much longer he could be employed.

30. However, for the first two months of my return, to plaintiff's surprise, he was not put on the night shift.

31. Plaintiff thought the problem had quietly resolved itself, however, in or about April 15, 2010, plaintiff was told that he would be put back on the night shift starting on April 30.

32. Plaintiff then invoked the FMLA mentioning his "disability" (without specifying it) and requesting intermittent leave from Lopez. Plaintiff also filed a complaint of disability discrimination with Brooks as a result of my not being accommodated.

33. As a result of this complaint, plaintiff was told that he would be taken off of nights. However, as of that moment, his employer immediately began retaliating against him.

34. Although, before the request for accommodation, plaintiff had been given praise, Lopez shortly thereafter – in 2010 – wrote up his 2009 evaluation, which was misdated 2008. The evaluation was negative, full of falsehoods,

misrepresentations and in was retaliation for having invoked his rights under the disability discrimination laws and the FMLA.

35. After that, Lopez never discussed anything of substance with plaintiff. She did not respond to emails plaintiff sent her, or communicate with him about the substance of plaintiff's job in any way other than in passing.

36. In one case, she even brought in another manager concerning an employee disciplinary issue who knew nothing about the incident in question.

37. In addition, despite its lip service, the employer reneged on its promise – and its requirement under the applicable laws – not to put plaintiff on nights. Whenever a night worker called out sick, plaintiff was assigned to fill in for them.

38. Indeed, in November 2010, a Ms. Hinds, a night auditor who only worked at night, took medical leave herself, and they put plaintiff in her position -- five days a week for two weeks.

39. Plaintiff was informed by Lissie's assistant that, "I have to do what is best for the company."

40. Plaintiff's response was that this would adversely affect his health. In private conversation with Lissie's assistant, who was plaintiff's personal friend for a time, plaintiff informed her of his diagnosis.

41. Again, there were at least one or two people willing to do night sessions other than plaintiff who was qualified to do the job. The employer did not consider the possibility of hiring a temp.

42. The schedules were redone and plaintiff was allowed to resume the day schedules. However, Lopez continued to refuse to plaintiff in manner other than superficially.

43. There were no complaints about plaintiff's performance during this time, however, on February 1, 2011, plaintiff was terminated.

44. Plaintiff was told the termination was as a result of a customer complaint from December 2010. However, plaintiff was never told about this complaint, nor given an opportunity to address it.

45. In fact, this was a pretext to discharge plaintiff in retaliation for having asserted his right to an accommodation or for intermittent leave under the FMLA.

46. There was either no customer complaints, or if there was, it was not the real reason for plaintiff's termination, nor considered cause for termination for employee at the Manhattan Club.

47. This particular employer never took customer complaints seriously, and they were rife for multiple reasons. First, the condition of the rooms at the timeshare was often shoddy.

48. Owners at the timeshare were typically angry with the staff, for reasons that staff could not control.

49. One reason the customers complained so much was the oversubscription of the more desirable rooms. Like any hotel, some timeshares had better views than others, were larger, etc.

50. The owners were usually lured into buying into the timeshare via model luxury units that were never like what those that were offered on a day-to-day basis.

51. There were many rooms with a view of Central Park that the prospective customers were told that they could reserve well from the future, or up to the day of the reservation. However, it was never this way. The staff, including plaintiff, was uniformly told not to allow reservations in the best rooms (i.e., the highest, those with the biggest square footage, and Park views), no matter how far in advance they were requested. Managers such as Lopez often utilized those rooms.

52. Additionally, availability of timeshare owner's choices was further diluted by (a) time share swappers who did not purchase an interest in the Manhattan Club, but were swapping with some other timeshare; and (b) selling rooms on the open market as hotel rooms through traditional search engines.

53. Customer complaints were rife because the company's practice to oversell timeshares based on the attractive units, then assign the less attractive units and the prospective owners signed up.

54. Plaintiff was always instructed to tell the owners that units were assigned on a "first come first serve basis," but that in fact was false. Staff at the Manhattan Club made assignments on a selective basis that kept the best rooms to be assigned at the whim of the managers.

55. Customer complaints were a constant on plaintiff's job, and never cause for termination without explanation. The alleged customer complaint against plaintiff was a pretext for plaintiff's termination, which in fact was the result of retaliation against plaintiff for demanding that the defendant accommodate his disability; retaliation against plaintiff for complaining about discrimination in the workplace; retaliation against plaintiff for invoking the FMLA to take the time off that he needed

for his medical condition; and its abject refusal to comply with its hollow promise that plaintiff be allowed nights off so that the medication that he needed to stay alive could work.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FAIR MEDICAL LEAVE ACT

56.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

57.     Defendants are covered employers under FMLA in that is employs more than fifty employees at all times.

58.     Plaintiff is a qualified employee under FMLA in that, inter alia, he suffers from a serious health condition for which he was entitled to intermittent leave.

59.     Defendant opposed and impeded plaintiff's requests for intermittent leave.

60.     Plaintiff was retaliated against because he insisted on working days, which the defendant knew he could accomplish legally by demanding intermittent leave.

61.     As a result of the foregoing, plaintiff has been damaged.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

62.     Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

63.     Plaintiff is a disabled person under the New York City Human Rights Law in that he suffers from an impairment of one or more bodily systems.

64.     Defendant opposed and impeded plaintiff's repeated requests for accommodations.

65.     Defendant retaliated against plaintiff for demanding accommodations and for complaining about disability discrimination in the workplace.

66. By virtue of the foregoing, defendants have violated the New York City Human Rights Law and plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands as follows:

    A.    Compensatory damages;

    B.    Punitive damages;

    C.    Cost of suit and attorneys fees;

    D.    Liquidated damages;

    E.    Such other relief as the Court may deem just and proper.

Dated:    New York, New York
October 4, 2011

/s/
GREGORY ANTOLLINO, ESQ.
18-20 West 21st Street, Suite 802
New York, New York 10010
(212) 334-7397